

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

D-1 Cemhan "Jimmy" Biricik,
D-2 Dr. Martin Perlin,

Defendants.

Case: 5:25-cr-20543
Assigned To : Levy, Judith E.
Referral Judge: Altman, Kimberly G.
Assign. Date : 7/22/2025
Description: SEALED MATTER
(LLH)

Violations:   18 U.S.C. § 1349
              18 U.S.C. § 1347

## INDICTMENT

THE GRAND JURY CHARGES:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment:

1.      Fast Lab Technologies, LLC (Fast Lab) was a Wyoming limited liability

company, formed on September 14, 2021.  Its principal place of business was

1178 Broadway, New York, NY 10001. Fast Lab purported to be a medical

diagnostic laboratory that offered a full range of bioanalytical testing services,

including at-home COVID tests at "zero cost" to the consumer.

2.      Fast Lab was enrolled or credentialed as a participating provider with

Medicare, Medicaid, TRICARE, the Federal Employees Healthcare Benefits

Program (FEHBP), and multiple private insurance plans.

3.      Defendant CEMHAN "JIMMY" BIRICIK, a resident of Florida, was the sole member and Chief Executive Officer of Fast Lab.

4.      Defendant Dr. MARTIN PERLIN, a resident of Connecticut, was the Medical Director and primary referring physician for Fast Lab.

5.      The Medicare Program (Medicare) was a federal healthcare program for the aged and disabled established by Congress in 1965, as Title XVIII of the Social Security Act and codified at 42 U.S.C. § 1395. Medicare was administered through the Centers for Medicare and Medicaid Services (CMS), a division of the United States Department of Health and Human Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

6.      Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

7.      Medicare included coverage under four primary components: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).  Medicare Part B covered the cost of physicians' services and other ancillary services (including testing) not covered by Part A.

8.      Under Medicare Part B, 42 CFR 410.32, all diagnostic laboratory tests and other diagnostic tests must be ordered by the physician who is treating the

beneficiary, that is, the physician who furnishes a consultation or treats a

beneficiary for a specific medical problem and who uses the results in the

management of the beneficiary's specific medical problem.

9.     Medicare Part D provided prescription drug coverage to persons who are

eligible for Medicare. Under the program, eligible Medicare beneficiaries were

able to enroll in a Medicare Prescription Drug Plan that added prescription drug

coverage to traditional Medicare. Alternatively, Medicare eligible beneficiaries

were able to obtain prescription drug coverage by enrolling in a Medicare

Advantage Plan under Part C of the Medicare program. Such Medicare

Advantage Plans provide the full range of Medicare coverage to enrollees,

including coverage for testing.

10.    Wisconsin Physicians Service was the CMS contracted carrier for Medicare

Part B in the state of Michigan. Cahaba Safeguard Administrators, LLC (Cahaba)

was the Program Safeguard Contractor for Medicare Part B in the state of

Michigan.

11.    By becoming a participating provider in Medicare, enrolled providers

agreed to abide by the policies and procedures, rules, and regulations governing

reimbursement. In order to receive Medicare funds, enrolled providers, together

with their authorized agents, employees, and contractors, were required to abide

3

by all the provisions of the Social Security Act, the regulations promulgated under

the Act, and applicable policies and procedures, rules, and regulations, issued by

CMS and its authorized agents and contractors.

12.     Health care providers who seek to bill Medicare were given and provided

with online access to Medicare manuals and services bulletins describing proper

billing procedures and billing rules and regulations. Providers were advised that

they could only submit claims to Medicare for medically necessary services they

rendered, and providers were required to maintain patient records to verify that

the services were provided as described on the claim.

13.     The Medicaid Program (Medicaid) as a Federal/State program which had as

its purpose the provision of medical services to those persons who could not

otherwise afford them.

14.     Pursuant to Title XIX of the Social Security Act (42 USC 1396, et seq.) and

the Michigan Social Welfare Act (400.1, et seq.; MSA 16.614(11), as amended, the

Michigan Department of Community Health (hereinafter referred to as DCH)

administered the Michigan Medical Assistance Program (hereinafter referred to as

Medicaid).

15.     Medicaid was a "health care benefit program" as defined by Title 18, United

States Code, Section 24(b).

4

16.     Health care providers who seek to bill Medicaid were informed of the rules and responsibilities through provider manuals that were provided to them by DCH at the time of enrollment, and periodically receive correspondence when policy/procedural changes occur. Providers were advised that they could only submit claims to Medicaid for medically necessary services they rendered, and providers were required to maintain patient records to verify that the services were provided as described on the claim.

17.     Medicaid and Medicare participating providers and/or facilities apply to Medicaid and Medicare programs for the ability to bill Medicaid and Medicare. As part of the application process, the providers must certify that they will comply with all Medicaid and Medicare statutes, regulations, and program guidance and they will not submit claims in reckless disregard of whether the claims are payable.

18.     Upon certification, each provider is issued a National Provider Identification (NPI) number. Medical providers submit claims to Medicaid and Medicare using their assigned NPI. When an individual medical provider was associated with a clinic, Medicare Part B required that the individual provider number associated with the clinic be placed on the claim submitted to the Medicare contractor.

19.     In order to receive reimbursement for a covered service from Medicare or

Medicaid, a provider was required to submit a claim, either electronically or using

a form (e.g., a Form CMS-1500 or UB-04), containing the required information

appropriately identifying the provider, beneficiary, and services rendered, among

other things. Each claim for reimbursement includes, at a minimum, the

beneficiary's name, the beneficiary's claim number, the date of service, the

diagnosis/nature of illness, and the procedure/services (annotated by a procedure

code).

20.     In order to bill the Medicare Part B Programs (or private insurance

programs), a medical provider must bill for one, or more, Current Procedural

Terminology (CPT) Code(s).  CPT Codes, which are developed and maintained

by the American Medical Association (AMA), are individualized numbers which

are assigned to every task or service a medical provider might perform on a

patient.  CPT codes are then used by Medicare, and private insurance companies,

to determine the amount of reimbursement, or payment, a medical provider will

receive for the task or service performed on a patient.   As CPT codes are meant

to ensure uniformity by the AMA, all medical providers and insurance companies

use the same set of CPT Codes, which are updated annually.

21.     TRICARE is a health program of the United States Department of Defense

("DoD") Military Health System that provided coverage for DoD beneficiaries worldwide, including active-duty service members, National Guard and Reserve members, retirees, and their families and survivors. The Defense Health Agency ("DHA"), an agency of DoD, was the entity responsible for overseeing and administering the TRICARE program.

22.    TRICARE was a "health care benefit program" as defined by 18 U.S.C. 4 § 24(b), that affected commerce, and as that term is used in 18 U.S.C. 5 § 1347. TRICARE was also a "federal health care program" as defined by 6 42 U.S.C. § 1320a-7b(f), that affected commerce, and as that term is used in 42 U.S.C. § 1320a-7b(b).

23.    According to 32 C.F.R., Part 199.4(1)(i), Basic Program Benefits, and subject to all applicable definitions, conditions, limitations, or exclusions specified in the regulation, TRICARE will only pay for medically necessary services and supplies required in the diagnosis and treatment of illness or injury and provided by authorized providers.

24.    In order to receive reimbursement for services rendered to health care benefit program beneficiaries, TRICARE requires providers to submit claim forms with the identifying provider number, the patient name, the diagnosis(s), the treatment(s) or services(s) rendered, the date of the treatment(s) and/or service(s).

25.    The Federal Employees Health Benefits Program (FEHBP) is a federally-
funded insurance program established by Congress in 1959, pursuant to the Federal
Employees Health Benefits Act.  5 U.S.C. § 8901 *et seq.*  The Program is for
federal employees, retirees, and their spouses and unmarried children under the age
of 26.  The Office of Personnel Management (OPM) administers the Program and
contracts with various health insurance carriers (Carriers) to provide services to
FEHBP members.  Monies for the FEHBP are maintained by the United States
Treasury in the Employees Health Benefits Fund (the Fund), which OPM
administers, and which is the source of all relevant payments to the Carriers for
services rendered to FEHBP members. Carriers do not have any right to monies
from the Treasury for reimbursement of benefits unless and until they incur
legitimate costs for actual covered services rendered to the members and submit
claims to the Government for the payment for those services.  FEHBP benefits are
payable only for services necessary to prevent, diagnose, or treat an illness,
disease, injury, or condition.

26.    Health Care Benefit Programs as defined by Title 18, United States Code,
Section 24(b) also include other, private sector employee benefit plans in that they
were private plans and contracts, affecting commerce, under which medical
benefits, items, and services were provided to individuals ("Private Benefit

8

Programs"). The provision of these medical benefits, items, and services occurred

via certain agreements with myriad health insurance companies including but not

limited to Aetna, UnitedHealthcare, and Blue Cross Blue Shield. These health care

benefit programs also were covered under Section (3)(1) of the Employee

Retirement Income Security Act of 1974 as they were established and maintained

by an employer for the purpose of providing for its participants and their

beneficiaries, through the purchase of insurance or otherwise, medical, surgical, or

hospital care and benefits.

27.     Private Benefit Programs compensated medical service providers for

medical services that they actually rendered and were medically necessary.

28.     In order to receive reimbursement from the Private Benefit Programs,

medical service providers submitted, or cause the submission of, claims, either

electronically or in writing, to the Private Benefit Programs for payment of

services, either directly or through a billing company.

29.     Private Benefit Programs required providers to keep written medical records

that accurately reflected patient histories, pertinent medical conclusions,

examination and test results, and recommendations for services to be rendered.

Providers were required to document the support for the submission of any claims

to the Private Benefit Programs and the Private Benefit Programs were allowed to

review the relevant patient files to determine whether the claim was, in fact, supported.

30.     On January 31, 2020, the Secretary of the Department of Health and Human Services declared the outbreak of the Novel Coronavirus (SARs-CoV-2) a public health emergency (PHE). The onset of the SARS-CoV-2 virus (commonly known as Covid-19) pandemic brought with it an urgent need to test individuals for COVID-19. As a result, on March 18, 2020, Congress passed the Families First Coronavirus Response Act ("FFCRA"), Pub. L.No. 116-127. The FFCRA required health plans and insurers to cover COVID-19 tests and testing in certain qualifying situations.

31.     On March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. 116-136. Section 3203 of the CARES Act ensured that "group health plans" and "health insurance issuers" provided coverage for "any qualifying coronavirus preventive service."

32.     There were two main categories of COVID-19 tests: (i) antigen tests (often referred to as "rapid" tests), and (ii) polymerase chain reaction (PCR) tests (often referred to as "laboratory" tests).

33.     Antigen tests allowed for quick results wherein the specimen collection (via nasal swab), specimen analysis, and test results are all administered at the

same location. As relevant here, if performed by an eligible professional in the office, they were often billed using CPT 87811.

34.     PCR tests generally took longer to get results and were conducted in a laboratory setting. As relevant here, if performed under the direction of a qualified provider, these tests were billed using codes U0003, U0005, and 87635. They normally required "specimen handling" to collect the samples and transport them to a laboratory for analysis. Specimen handling services were billed using G2023.

35.     On May 8, 2020, CMS removed the requirement that the clinical diagnostic laboratory tests for COVID-19 and certain related viruses must be ordered by a treating physician or non-physician practitioner (NPP) who uses the tests in the management of the patient's specific medical problem. However, on September 2, 2020, CMS revised this policy by specifying that each beneficiary may receive Medicare coverage for one COVID-19 and related test without the order of a physician or other health practitioner, but Medicare will require such an order to cover further COVID-19 and related tests by a treating physician or non-physician practitioner (NPP) who uses the tests in the management of the patient's specific medical problem.

36.     The initial coverage requirements of the FFCRA and Cares Act were

primarily directed at COVID-19 testing done by clinical professionals or their qualified subordinates after an individual assessment, not "at-home" or "over the counter" tests self-administered by patients themselves.

37.    That changed on January 15, 2022, when the government required private plans to cover up to eight over the counter ("OTC") COVID-19 tests per individual per month. This coverage requirement was primarily meant to address tests that were, (i) self- administered using specimens that were self-collected, and (ii) authorized, cleared, or approved by the Food and Drug Administration (the "FDA"). As a practical matter, because PCR tests require "specimen collection" by a professional (or under their supervision), this mandate was only applicable to antigen; i.e. "rapid" tests.

38.    In order to ensure accurate billing and prevent exploitation by providers, the Federal Government, through the Centers for Medicare and Medicaid Services (CMS), issued billing guidance that specifically instructed providers seeking reimbursement for OTC at-home tests to use CPT code K1034.

39.    On May 11, 2023, the PHE ended, and Medicare and private insurance companies were no longer required to cover OTC at-home tests. Beginning May 12, 2023, only diagnostic COVID-19 tests ordered by a doctor and conducted in a doctor's office, clinic, or pharmacy were covered by Medicare and private

insurance companies.

## COUNT ONE

### (18 U.S.C. §1349 – Conspiracy to Commit Health Care Fraud)

**D-1 CEMHAN "JIMMY" BIRICIK**
**D-2 DR. MARTIN PERLIN**

40.     Paragraphs 1 through 39 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

41.     Beginning in or about September 2021, and continuing  through the present, the exact dates being unknown to the grand jury, in the Eastern District of Michigan, Southern Division, and elsewhere, the defendants, CEMHAN "JIMMY" BIRICIK, Dr. MARTIN PERLIN, and others known and unknown to the grand jury, did willfully and knowingly combine, conspire, confederate and agree to violate Title 18, United States Code, Section 1347, that is, to execute a scheme and artifice to defraud a health care benefit program, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, Medicaid, and various private insurers, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care

13

benefits, items, and services.

## Purpose of the Conspiracy

42. It was the purpose of the conspiracy for the defendants to unlawfully enrich themselves by, among other things, (a) submitting false and fraudulent claims to Medicare, Medicaid, and various private insurers for services that were not provided as represented; (b) concealing the submission of false and fraudulent claims to Medicare, Medicaid, and various private insurers, and the receipt and transfer of the proceeds from the fraud; and (c) diverting proceeds of the fraud for the personal use and benefit of the defendants.

## Manner and Means

43. The Manner and means by which BIRICIK and PERLIN and their co-conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

44. Beginning in or around September 2021, BIRICIK organized Fast Lab as a Wyoming limited liability company with its principal place of business in New York City, New York. On or about January 18, 2022, BIRICIK submitted an 855B form with CMS. During the submission process, BIRICIK electronically signed the certification statement indicating that he agreed, among other things, to abide by the Medicare laws, regulations, and program instructions, and that he

understood that payment of Medicare claims is conditioned upon the claim and underlying transaction complying with such laws, regulations, and program instructions. By signing the certification statement, BIRICIK also agreed that he would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and would not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

45.     Despite these certifications, BIRICIK proceeded to present and cause to be presented false and fraudulent claims for payment by Medicare, Medicaid, and various private insurers, as described below.

46.     During the relevant time period, BIRICIK and others devised and participated in a scheme in which Fast Lab would solicit Medicare, Medicaid, TRICARE, FEHBP, and Private Benefit Program beneficiaries to provide their insurance information in exchange for "no cost" Covid-19 tests. Once in possession of this insurance information, BIRICIK would submit and cause the submission of claims to the various health care benefit programs for services that were not provided as represented; namely, Fast Lab purported that they were either (1) in the case of rapid tests, observing the administration of the tests and reading and providing results to the beneficiaries, or (2) in the case of laboratory tests, collecting samples from beneficiaries and then performing laboratory testing on

those samples.  In reality, the antigen tests were not observed, and the results were

not read by medical professionals; and PCR tests were not conducted, and samples

were not collected from the beneficiaries.

47.    Rather that submit claims under CPT code K1034 (for the billing of self-

administered or self-collected tests), Fast Lab submitted claims as though they had

directly observed the antigen tests, or collected saliva samples and performed

laboratory testing on the samples, under the five high-reimbursement CPT codes in

the table below:

| CPT Code | Description |
|---|---|
| U0003 | Infectious agent detection by nucleic acid (DNA or RNA); severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) (Coronavirus disease [COVID-19]), amplified probe technique, making use of high throughput technologies |
| U0005 | Infectious agent detection by nucleic acid (DNA or RNA); severe acute respiratory syndrome coronavirus 2 (SARS-COV-2) (Coronavirus disease (COVID-19)), amplified probe technique, CDC or non-CDC, making use of high throughput technologies, completed within two calendar days from date and time of specimen |
| G2023 | Specimen collection for severe acute respiratory syndrome coronavirus 2 (sars-cov-2) (coronavirus disease [COVID-19]), any specimen source |
| 87635 | Infectious agent detection by nucleic acid (DNA or RNA); severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) (Coronavirus disease [COVID-19]), amplified probe technique |
| 87811 | Infectious agent antigen detection by immunoassay with direct optical (ie, visual) observation; severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) (Coronavirus disease [COVID-19]) |

48.    It was part of the scheme and artifice to defraud that Fast Lab would

advertise the availability of no cost Covid-19 tests on the internet and via various

16

social media websites.

49.     It was further part of the scheme and artifice that Fast Lab maintained a

website (fastlabtech.com) where individuals seeking quick, convenient Covid-19

testing could order no cost tests for home delivery.

50.     When individuals seeking Covid-19 testing navigated to the fastlabtech site,

they were instructed to provide their biographical and insurance information.

Individuals would then be asked to select from a list of symptoms they were

experiencing.  After that, individuals were asked to acknowledge assignment of

benefits and appointment of representative statements, to authorize the billing of

their insurance.

51.     After completing the order details, individuals were then immediately

connected with a non-physician employee via web-enabled chat.  The chat window

would include their list of pre-populated symptoms, and the employee would ask

when those symptoms occurred.  After a response from the individual, the non-

physician employee would respond, advising that the order had been approved and

finalized.

52.     It was further part of the scheme and artifice that Dr. PERLIN signed the

requisition order form for both antigen and PCR tests, attesting he was the treating

physician, and the test was ordered as part of a treatment plan, when in fact he

17

never saw or treated the beneficiary.  These orders contained an acknowledgment, next to Dr. PERLIN'S signature, reminding "all physicians that when ordering tests expected to be paid under federal health care programs, such as Medicare and Medicaid, the tests must meet the following conditions: (1) included as covered services, (2) reasonable, (3) medically necessary for the treatment and diagnosis of the patient and (4) not for screening purposes."

53.    It was further part of the scheme and artifice that upon mailing a selection of rapid and PCR test kits, Fast Lab would immediately bill the customer's insurance as though Fast Lab had (1) directly-observed the administration of a rapid test and read the results for the beneficiary, and (2) collected a saliva sample and performed a PCR test in a laboratory.  These billings were often initiated before the test kits even arrived at the customers' residences.  Similarly, these insurance billings occurred even when the rapid tests were left unopened, and no saliva samples were returned to Fast Lab.

54.    It was further part of the scheme and artifice that once a beneficiary's insurance had been successfully billed, BIRICIK would thereafter repeatedly bill, or cause to be billed, a given beneficiary's insurance at regular intervals for the performance of additional tests, without the customer's knowledge or consent.  The additional tests that were billed were, in fact, never performed.

18

55.     In execution of the scheme and artifice to defraud, beginning on or about

September 14, 2021, and continuing through the present, BIRICIK and PERLIN

submitted or caused Fast Lab to submit the following fraudulent claims, for

Covid-19 laboratory testing services that were either not rendered at all or not

provided as represented:

- Approximately $180 million in claims to Medicare Part B;

- Approximately $220 million in claims to Medicare Part C;

- Approximately $101 million in claims to Private Benefit Programs;

- Approximately $55 million in claims to Medicaid;

- Approximately $8 million in claims to TRICARE; and

- Approximately $2 million in claims to FEHBP plans.

As a result of these claims, Medicare, Medicaid, TRICARE, FEHBP, and multiple

Private Benefit Programs paid a combined total of more than $50 million.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH FIFTY-NINE
### (18 U.S.C. §1347 - Health Care Fraud)

**D-1     CEMHAN "JIMMY" BIRICIK**
**D-2     DR. MARTIN PERLIN**

56.     Paragraphs 1 through 39 of the General Allegations section of this

Indictment are realleged and incorporated by reference as though set forth fully

herein.

57.     Beginning on or about September 14, 2021, and continuing through the

present, in the Eastern District of Michigan, and elsewhere, the defendants

CEMHAN "JIMMY" BIRICIK and Dr. MARTIN PERLIN in connection with the

delivery of and payment for health care benefits, items, and services, did

knowingly and willfully execute, and attempt to execute, a scheme and artifice to

defraud a health care benefit program affecting commerce, as defined in Title 18,

United States Code, Section 24(b), that is Medicare, Medicaid, and various private

insurers, and to obtain by means of materially false and fraudulent pretenses,

representations, and promises, money and property owned by and under the

custody and control of Medicare, Medicaid, Tricare, and various private insurers in

connection with the delivery of and payment for health care benefits, items, and

services, by submitting and causing the submission of false and fraudulent claims.

## Purpose of the Scheme and Artifice

58.     Paragraph 42 of this Indictment is re-alleged and incorporated by reference

as though fully set forth herein as a description of the purpose of the scheme and

artifice.

## The Scheme and Artifice

59.     Paragraphs 43 through 55 of this Indictment are re-alleged and incorporated

20

by reference as though fully set forth herein as a description of the scheme and artifice.

60.     In execution of the scheme and artifice, CEMHAN "JIMMY" BIRICIK and Dr. MARTIN PERLIN caused the submission of the following claims to Medicare for services that were never rendered:

| Count | Defendants | Beneficiary | "Service" Date | CPT Code | Insurance | Billed Amount | Paid Amount |
|---|---|---|---|---|---|---|---|
| 2. | D1-BIRICIK, D2-PERLIN | H.A. | 8/9/2024 | 87811 | Medicare | $325.00 | $40.55 |
| 3. | D1-BIRICIK, D2-PERLIN | H.A. | 9/1/2024 | 87811 | Medicare | $325.00 | $40.55 |
| 4. | D1-BIRICIK, D2-PERLIN | R.A.F. | 9/6/2024 | 87811 | Medicare | $325.00 | $40.55 |
| 5. | D1-BIRICIK, D2-PERLIN | R.A.F. | 10/5/2024 | 87811 | Medicare | $325.00 | $40.55 |
| 6. | D1-BIRICIK, D2-PERLIN | T.A.F. | 9/26/2024 | 87811 | Medicare | $325.00 | $40.55 |
| 7. | D1-BIRICIK, D2-PERLIN | T.A.F. | 10/16/2024 | 87811 | Medicare | $325.00 | $40.55 |
| 8. | D1-BIRICIK, D2-PERLIN | V.P. | 9/29/2024 | 87811 | Medicare | $325.00 | $40.55 |
| 9. | D1-BIRICIK, D2-PERLIN | V.P. | 10/28/2024 | 87811 | Medicare | $325.00 | $40.55 |
| 10. | D1-BIRICIK, D2-PERLIN | M.Y.G. | 11/13/2023 | 87635 | Medicare | $325.00 | $51.31 |
| 11. | D1-BIRICIK, D2-PERLIN | M.Y.G. | 11/14/2023 | 87811 | Medicare | $325.00 | $41.38 |
| 12. | D1-BIRICIK, D2-PERLIN | L.M | 3/2/2023 | U0003 | Medicare | $325.00 | $73.50 |
| 13. | D1-BIRICIK, D2-PERLIN | L.M | 3/2/2023 | U0005 | Medicare | $75.00 | $24.50 |
| 14. | D1-BIRICIK, D2-PERLIN | L.M | 3/2/2023 | G2023 | Medicare | $75.00 | $22.99 |
| 15. | D1-BIRICIK, D2-PERLIN | L.M | 3/3/2023 | U0003 | Medicare | $325.00 | $73.50 |

| 16. | D1-BIRICIK, D2-PERLIN | L.M | 3/3/2023 | U0005 | Medicare | $75.00 | $24.50 |
|---|---|---|---|---|---|---|---|
| 17. | D1-BIRICIK, D2-PERLIN | L.M | 3/3/2023 | G2023 | Medicare | $75.00 | $22.99 |
| 18. | D1-BIRICIK, D2-PERLIN | P.L. | 5/1/2023 | U0003 | Medicare | $325.00 | $73.50 |
| 19. | D1-BIRICIK, D2-PERLIN | P.L. | 5/1/2023 | U0005 | Medicare | $75.00 | $24.50 |
| 20. | D1-BIRICIK, D2-PERLIN | P.L. | 5/1/2023 | G2023 | Medicare | $75.00 | $22.99 |
| 21. | D1-BIRICIK, D2-PERLIN | P.L. | 5/2/2023 | U0003 | Medicare | $325.00 | $73.50 |
| 22. | D1-BIRICIK, D2-PERLIN | P.L. | 5/2/2023 | U0005 | Medicare | $75.00 | $24.50 |
| 23. | D1-BIRICIK, D2-PERLIN | P.L. | 5/2/2023 | G2023 | Medicare | $75.00 | $22.99 |
| 24. | D1-BIRICIK, D2-PERLIN | N.K. | 1/18/2023 | U0003 | Medicare | $325.00 | $73.50 |
| 25. | D1-BIRICIK, D2-PERLIN | N.K. | 1/18/2023 | U0005 | Medicare | $75.00 | $24.50 |
| 26. | D1-BIRICIK, D2-PERLIN | N.K. | 1/18/2023 | G2023 | Medicare | $75.00 | $22.99 |
| 27. | D1-BIRICIK, D2-PERLIN | N.K. | 1/25/2023 | U0003 | Medicare | $325.00 | $73.50 |
| 28. | D1-BIRICIK, D2-PERLIN | N.K. | 1/25/2023 | U0005 | Medicare | $75.00 | $24.50 |
| 29. | D1-BIRICIK, D2-PERLIN | N.K. | 1/25/2023 | G2023 | Medicare | $75.00 | $22.99 |
| 30. | D1-BIRICIK, D2-PERLIN | A.D. | 7/20/2023 | 87811 | Medicaid | $325.00 | $34.26 |
| 31. | D1-BIRICIK, D2-PERLIN | A.D. | 7/21/2023 | 87811 | Medicaid | $325.00 | $34.26 |
| 32. | D1-BIRICIK, D2-PERLIN | E.F. | 3/22/2024 | 87811 | Medicaid | $325.00 | $34.26 |
| 33. | D1-BIRICIK, D2-PERLIN | E.F. | 3/24/2024 | 87635 | Medicaid | $325.00 | $42.49 |
| 34. | D1-BIRICIK, D2-PERLIN | M.M. | 5/9/2023 | 87811 | UHC (ERISA) | $325.00 | $45.52 |
| 35. | D1-BIRICIK, D2-PERLIN | M.M. | 5/9/2023 | G2023 | UHC (ERISA) | $75.00 | $25.81 |

| 36. | D1-BIRICIK, D2-PERLIN | M.M. | 5/11/2023 | 87811 | UHC (ERISA) | $325.00 | $45.52 |
|---|---|---|---|---|---|---|---|
| 37. | D1-BIRICIK, D2-PERLIN | M.M. | 5/11/2023 | G2023 | UHC (ERISA) | $75.00 | $25.81 |
| 38. | D1-BIRICIK, D2-PERLIN | S.P. | 12/29/2022 | U0003 | Aetna (ERISA) | $325.00 | $75.00 |
| 39. | D1-BIRICIK, D2-PERLIN | S.P. | 12/29/2022 | U0005 | Aetna (ERISA) | $75.00 | $25.00 |
| 40. | D1-BIRICIK, D2-PERLIN | S.P. | 12/29/2022 | G2023 | Aetna (ERISA) | $75.00 | $23.46 |
| 41. | D1-BIRICIK, D2-PERLIN | S.P. | 12/31/2022 | U0003 | Aetna (ERISA) | $325.00 | $75.00 |
| 42. | D1-BIRICIK, D2-PERLIN | S.P. | 12/31/2022 | U0005 | Aetna (ERISA) | $75.00 | $25.00 |
| 43. | D1-BIRICIK, D2-PERLIN | S.P. | 12/31/2022 | G2023 | Aetna (ERISA) | $75.00 | $23.46 |
| 44. | D1-BIRICIK, D2-PERLIN | A.C. | 1/4/2023 | U0003 | BCBS (FEHBP) | $325.00 | $325.00 |
| 45. | D1-BIRICIK, D2-PERLIN | A.C. | 1/4/2023 | U0005 | BCBS (FEHBP) | $75.00 | $75.00 |
| 46. | D1-BIRICIK, D2-PERLIN | A.C. | 1/4/2023 | G2023 | BCBS (FEHBP) | $75.00 | $75.00 |
| 47. | D1-BIRICIK, D2-PERLIN | A.C. | 1/5/2023 | U0003 | BCBS (FEHBP) | $325.00 | $325.00 |
| 48. | D1-BIRICIK, D2-PERLIN | A.C. | 1/5/2023 | U0005 | BCBS (FEHBP) | $75.00 | $75.00 |
| 49. | D1-BIRICIK, D2-PERLIN | A.C. | 1/5/2023 | G2023 | BCBS (FEHBP) | $75.00 | $75.00 |
| 50. | D1-BIRICIK, D2-PERLIN | M.W. | 12/9/2022 | U0003 | BCBS (FEHBP) | $325.00 | $325.00 |
| 51. | D1-BIRICIK, D2-PERLIN | M.W. | 12/9/2022 | U0005 | BCBS (FEHBP) | $75.00 | $75.00 |
| 52. | D1-BIRICIK, D2-PERLIN | M.W. | 12/9/2022 | G2023 | BCBS (FEHBP) | $75.00 | $75.00 |
| 53. | D1-BIRICIK, D2-PERLIN | M.W. | 12/16/2022 | U0003 | BCBS (FEHBP) | $325.00 | $325.00 |
| 54. | D1-BIRICIK, D2-PERLIN | M.W. | 12/16/2022 | U0005 | BCBS (FEHBP) | $75.00 | $75.00 |
| 55. | D1-BIRICIK, D2-PERLIN | M.W. | 12/16/2022 | G2023 | BCBS (FEHBP) | $75.00 | $75.00 |
| 56. | D1-BIRICIK, | L.R. | 10/26/2023 | 87811 | TRICARE | $325.00 | $262.86 |

| | D2-PERLIN | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 57. | D1-BIRICIK, D2-PERLIN | L.R. | 10/31/2023 | 87811 | TRICARE | $325.00 | $262.86 |
| 58. | D1-BIRICIK, D2-PERLIN | R.A. | 12/28/2023 | 87811 | TRICARE | $325.00 | $197.14 |
| 59. | D1-BIRICIK, D2-PERLIN | R.A. | 12/30/2023 | 87811 | TRICARE | $325.00 | $197.14 |

All in violation of Title 18, United States Code, Section 1347.

## FORFEITURE ALLEGATIONS

## (18 U.S.C. §§ 981(a)(l)(C) and 982(a), 28 U.S.C. § 2461)

61.     The allegations contained in this Indictment above are incorporated by

reference as if set forth fully herein for the purpose of alleging forfeiture pursuant

to the provisions of 18 U.S.C. §§ 981(a)(l)(C), 982(a), and 28 U.S.C. § 2461.

62.     Upon conviction of the offenses alleged in Counts One through Fifty-Nine

of the Indictment, the defendants shall forfeit to the United States any property,

real or personal, that constitutes or is derived, directly or indirectly, from gross

proceeds traceable to such offenses.  For Count One, such forfeiture will be

pursuant to the terms of 18 U.S.C. § 981(a)(l)(C), together with 28 U.S.C. §

2461(c).  For Counts Two through Fifty-Nine, such forfeiture will be pursuant to

the terms of 18 U.S.C. § 982(a)(7).  Property thus subject to forfeiture includes, but

is not limited to, the following:

24

a. Real property located at 9623 Macchiato Ave. Boca Raton, FL 33496,

and being more fully described as:

LEGAL ADDRESS:  Lot 361, HYDER AGR-PUD -SOUTH PLAT FIVE, according to the map or plat thereof as recorded in Plat Book 129, Page 123, Public Records of Palm Beach County, Florida

COMMONLY KNOWN AS: 9623 Macchiato Ave. Boca Raton, FL 33496

PARCEL ID: 00-42-46-31-14-000-3610

TITLED TO: Cemhan Biricik and Isabel Biricik, Husband and Wife

b. Cirrus SR22T aircraft, bearing tail number 203FD, S/N: 10395,

including all sets of keys, flight logs, and maintenance logs

belonging to said aircraft.

c. 2022 Ford Bronco Raptor (VIN: 1FMEE5JR1NLA50344)

d. 2022 Ford Bronco Sport (VIN: 3FMCR9C69NRE24285)

e. 2023 Rivian R1T (VIN: 7FCTGAAA7PN021960)

f. 2023 Bentley Bentayga (VIN: SJAAR2ZVXPC023963)

g. 2023 Lamborghini Urus (VIN: PBUC3ZLXPLA25853).

h. 2023 Audi A3 (VIN: WA1EECF36P1144452)

i. 2024 BMW M4 (VIN: WBS33BA02RCP10794)

63.     Substitute Assets: If the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

  i.      Cannot be located upon the exercise of due diligence;

  ii.     Has been transferred or sold to, or deposited with, a third party;

  iii.    Has been placed beyond the jurisdiction of the Court;

  iv.     Has been substantially diminished in value; or

  v.      Has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by 18 U.S.C. Section 982(b), to seek to forfeit any other property of defendant up to the value of the above-described property subject to forfeiture.

64.     Money Judgment: Upon conviction of violating Title 18, United States Code, Sections 1349 and/or 1347, defendants shall be ordered to pay the United States a sum of money equal to the total amount of proceeds defendants obtained as a result of such violation(s).

THIS IS A TRUE BILL


<u>s/GRAND JURY FOREPERSON</u>


JEROME F. GORGON JR.
United States Attorney

<u>s/JOHN K. NEAL</u>
John K. Neal
Chief, Anti-Corruption Unit

<u>s/REGINA R. McCULLOUGH</u>
Regina R. McCullough
Assistant United States Attorney
211 W. Fort St., Ste. 2001
Detroit, MI 48226
Phone: (313) 226-9618
Email: <u>regina.mccullough@usdoj.gov</u>

<u>s/RYAN A. PARTICKA</u>
Ryan A. Particka
Assistant United States Attorney
211 W. Fort St., Ste. 2001
Detroit, MI 48226
Phone: (313) 226-9635
Email: <u>ryan.particka@usdoj.gov</u>


Dated: July 22, 2025

**ORIGINAL**

| United States District Court<br>Eastern District of Michigan | **Criminal Case Cove** | Case: 5:25-cr-20543<br>Assigned To : Levy, Judith E.<br>Referral Judge: Altman, Kimberly G.<br>Assign. Date : 7/22/2025<br>Description: SEALED MATTER<br>(LLH) |
| --- | --- | --- |

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately.

| Companion Case Information | Companion Case Number: |
| --- | --- |
| This may be a companion case based upon LCrR 57.10 (b)(4)¹: | Judge Assigned: |
| ☐ Yes    ☒ No | AUSA's Initials:    *RM* |

Case Title: USA v.  CEMHAN BIRICIK, et al.

County where offense occurred :  Wayne and elsewhere

Check One:    ☒ Felony        ☐ Misdemeanor        ☐ Petty

    ✓ Indictment/____ Information --- **no** prior complaint.
    ____ Indictment/____ Information --- based upon prior complaint [Case number:        ]
    ____ Indictment/____ Information --- based upon **LCrR 57.10 (d)** *[Complete Superseding section below]*.

## Superseding Case Information

Superseding to Case No: _____    Judge: _____

  ☐ Corrects errors; no additional charges or defendants.
  ☐ Involves, for plea purposes, different charges or adds counts.
  ☐ Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
| --- | --- | --- |

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

July 22, 2025
_____
Date

*Regina R. McCullough*

REGINA R. MCCULLOUGH
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226-3277
Phone: 313-226-9618
E-Mail address: regina.mccullough@usdoj.gov

¹ Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.